Our final case for this morning is United States v. Tolbert. Mr. Lenio. Thank you, Your Honor. My name is Mark Lenio and I represent Jarvis Tolbert. Jarvis Tolbert appeals the district court's ruling denying his motion to suppress evidence following a warrantless search by police at a hotel room rented by Tolbert for a friend. The facts of this case, for the most part, are accurately set forth in the district court's opinion. After a fight with his girlfriend, Mr. Tolbert tried to rent a room at the Residence Inn in South Bend, Indiana. However, Mr. Tolbert wasn't allowed to rent the room because he didn't have a credit card. So there's a little bit, it may not matter, I mean I guess he's told, he says something about there being no vacancy and then Dixon winds up doing it on Priceline or something like that. Correct. It kind of makes you wonder, no vacancy or we just don't want to rent to you? I don't know. Sometimes I found that they reserve a number of rooms for Priceline online customers. There was a testimony established at the suppression hearing that the hotel was very busy that night. The hotel layout has buildings that are separately located with kind of in a horseshoe type fashion with separate independent buildings. So here's my problem with this. He winds up renting the room through the friend, through Dixon. And Dixon doesn't hand over this probably, as far as he's concerned, irrelevant piece of paper about the no party policy. But the fact is that the hotel does seem to reserve the right to evict people for obnoxious behavior and they're getting complaints from the room above and from other guests. And if they have that right to evict, then why isn't it okay for them to give the police officer the passkey and send the officer up and say, hey, would you tell these people to get out of here? Of course, they don't know the room is empty at that point. Right. Well, there was what's called a service recovery log where the hotel clerk actually logged any calls or complaints that she had received from anybody at the hotel. In this particular case, there was only one instance where there was anything logged and it was almost simultaneously occurring when a CO2 monitor... Carbon monoxide. Well, it said CO2, so carbon monoxide monitor went off. It went off at the main desk. At that point, she called the room and said, hey, I need to come down here and check this. Right, right. In the meantime, before she even leaves her front desk area, she receives a who says we smell smoke. And it's a no-smoking hotel. It's a no-smoking. They do have a sliding door with a patio area and they have been out smoking on the patio area, apparently too close to the building where the smoke went up stairs. And that's why when the hotel clerk came down to the room and spoke with Mr. Tolbert, she advised... She didn't tell Mr. Tolbert that there were any complaints or that they had done anything wrong or they were in trouble. Right. She just said basically go out and smoke in the parking lot. No, I understand that. But what I want to focus on, which seems to be the focus of your argument, is the second time there's a problem, she's not free to leave the desk because there's nobody else around, it's the middle of the night, and she's getting complaints from people. So she asks the officers to kick out the occupants of room 912. Now do you think that was somehow beyond her authority? Well, first of all, the evidence in the record was she came down to the room at about 11 o'clock at night. Well, no, I know. I'm trying to move ahead. I'm trying to say they eventually, the police come and she testifies that she instructed them to kick out the occupants of room 912. If they refuse to leave, arrest them for trespassing. And your theory seems to be that she can't back that up by giving the police officers the room pass key, which she does. That's how they get in. You know, they knock on the door, they use the master key or whatever kind of key it is. She just gives them the key. It's one of those magnetic things, I'm sure. And then they look around the room, which is of course, you know, they figure, well, the guy's being evicted, we should take his stuff down. And that's when they see the bag with the cocaine in the top. Right. So I'm trying to figure out at what point have they overstepped the line? When they walk into the room, when she sends them upstairs, when they walk into the bathroom, where's the problem? Our position is that, first of all, if you didn't have the right to actually let them enter the room, period. Why not? Following the same type of logic that you get in cases like Minnesota versus Olson, someone staying where the police come with a warrantless search and are looking for a murder suspect holed up in a house as a house guest. But this is a hotel-based reason that she's having them go into the room. She has the police. Could she have gone into the room, do you think, if there had been another backup person at the desk? I don't know if she could actually enter the room unless there was maybe some type of emergency that was going on. I think their hotel policy was to actually call the room or go to the room. The whole point is that there was never any notice or warnings ever given. I understand that, and I'm trying to figure out. So let's take that as the baseline. I don't think anybody says there was because no one's relying on this piece of paper that Dixon signed. So the argument has to be that somehow the Fourth Amendment imposes a notice requirement before a person can be evicted from a hotel room. By the way, I'm at least personally not worried about the fact that he isn't the one who rented it. Sometimes there will be two or three friends staying in a hotel room. It seems like they all have an occupancy interest in it. But this notice idea, if the hotel is saying,  We're just going in because you're being a pest, and we have decided you're not the kind of guest we want. If they were permitted to actually, let's assume that they were, the police were permitted to enter the room to evict these people. The whole point about the police entry into the room is they determine almost immediately. I mean, we're talking about a hotel room. We're not talking about searching a two-level house. This one was on the first floor with a sliding door, right? Correct. And there was nobody there. So you're saying it's obvious instantly that there's nobody there. It's instantly. Within 15 to 30 seconds, they know nobody's there. The room is essentially clean. The bed has not been slept in. There's three Grey Goose vodka bottles, empty bottles there. There's some cigarettes in the ashtray. That's it. And they had completed their entire purpose of going in there to look for people to evict. Right. And then they testify, since she's saying kick them out, they decide that they'll take property left in the room back down to the front desk. That's what gets them into the bathroom in the duffel bag, which is, of course, the whole problem. And the whole point about that is that this is something that the police took upon themselves. I mean, the hotel clerk never asked them to go secure the room, secure the contents, to do anything other than just kick these guys out. Right. You think housekeeping should have emptied the room, not the police. Correct. Correct. Well, you know, I did have a problem a little bit initially, you know, where Dixon rents the room and then hands the keys over to somebody else. Dixon is the, they think, who's the guy who's the tenant. I mean, the guy that's staying at the hotel. And I maybe, there was a finding that Tolbert has, the right to be there to expect privacy. Correct. And just because he's there, but he's not Dixon, who I would say is the guy who had the right, and then these other people are guests. Now maybe that just extends to everybody who shows up. Well, I don't think. But if they're not making an issue out of it, and the court, I guess, made a finding that he had a protected interest. Right. And what the court was looking at is the two-part step, two-part test in Katz. First of all, whether or not there's a subjective expectation. Subjective. Right. And then would society view that as reasonable? Our position is that society would view someone who has had an opportunity to rent a room, someone else, then the only reason is that this guy couldn't do it himself. He didn't have a credit card. That's the only reason. Yeah, but Tolbert didn't have the warning that went with the credit card. Correct. And credit cards, they like to have those because if somebody overstays, et cetera, they still charge somebody who only has cash. Right. For whatever the reason, it doesn't matter. And that's something. But they did have the right to evict, according to the sign-in statement. Right. And that's something I think that's included on the warnings that are on the back of hotel rooms that we see. I see I'm out of time. Yes, you are. Thank you very much. Mr. Maciejuk. Thank you, Your Honor. My name is John Maciejuk, and I'm here representing the United States and asking that this court uphold the judgment of the district court. And I think that this decision kind of hinges on the standard of review that this court applied to the issue of whether or not the expectation of privacy in the room was reasonable. Not just that he had a subjective expectation of privacy, but whether it was reasonable. And that's the clearly erroneous standard that this court used in Proc now. And I'd also like to mention that I think every other court that has found that a hotel, motel guest that has been evicted, that the expectation of privacy has evaporated at that point. So, I mean, there are a couple things about this. I mean, first of all, on this fact that it's Dixon who does the renting and Tolbert is staying there. I mean, that scenario happens all the time. You know, Susan and Katie go on a trip and Katie rents the room and goes off and runs an errand, and Susan is the one who's there and she's not on the check-in. I mean, people for the most innocent reasons do this sort of thing. So I don't think there's much to that part of the problem. I guess your idea is that the minute the intent to evict is formulated in the mind of the hotel clerk, whether or not the occupant of the room knows about it, they've lost their reasonable expectation of privacy. Well, that's what the cases seem to say, and it's specifically Proc now. You don't have to call or say we're going to evict you and let you self-evict. There's no notice requirement. In Proc now, the individual was taken into custody and there was no notice at all given under the Minnesota statute. There was no notice required under that. Similarly, under the Indiana statutes, the statute for eviction that requires notice of a tenant of a leasehold specifically exempts hotels and motels. In this case, there is no corresponding Indiana statute to what there was in Minnesota. I went to great lengths to try to find something, even called the Association of Hotels and Motels of Indiana or something. They were not aware of anything. So it's a common law thing. The case that I cited, I think, is Halliday v. Auburn. It says that there is essentially no notice required. Well, it's one thing to say there's no notice required for an eviction. It's another thing to say that the police get to enter the room, sweep it, not just for people but for items, which doesn't really have anything to do with it. The hotel doesn't need to use the police to take a duffel bag out of the room, and typically the hotel would not use the police to do that. So I think it's important not to conflate too many things here. Well, the police were acting with the authority that the hotel had at that time. Once the person is evicted, once they make the decision to evict the person, they have the authority to enter into that room and have people removed. And that's exactly, well, in Procknell it was a dog that was sent in there. The officers were sent in to get a dog, and they saw these items in plain view. And in Rambo, actually that's escaping. The facts of that one are escaping me right now. I'm sorry. But that also involved Minnesota law, I believe. But in this case, the officers were in the room, and it's not just a typical room that has a bed and a bathroom. This was a studio apartment with, I think, a kitchen. So the officers did a sweep. The officers noticed that there was a bag there, and the officers decided to, as they were leaving, decided to take the bag as a favor to the occupant, I suppose, and the person up front, thinking that whoever was going to come back would want this. Now, specifically, did that exceed what she had asked them to do? Well, she asked him to evict the people. Normally, when people are evicted, they take their property with them. And in this case, they were just providing that function. I would say that encompasses evicting somebody from a motel room. Certainly, I mean, this was not the type of police conduct upon which the exclusionary rule would apply, because they're not doing anything in bad faith. They're just trying to do somebody a favor, and they happen in the process to see, in plain view, this crack cocaine. Well, they're implicitly enforcing the state's criminal trespass laws. She invokes those laws, so they are engaged in a police function. And then they turn the bag inside out when they get it back to the police station and find all the rest of the stuff in it. They don't stop with what they see in plain view. Yes, and that, I think, was probably, to my – I don't think there's any problem with the plain view, because he was there where he was supposed to be. It was immediately obvious to him. But when they get the bag back to the police station, should they have gotten a search warrant, kind of like the officers did in Prague now? They went and got a search warrant, and the bag was in their custody. But the officers – I think that that is harmless error, because the court concluded, based on the PSR, that when the officer looked in the bag, he saw crack cocaine, and that that's what he saw on top of the bag. And that's what the officer described on – excuse me a second, Your Honor. On page 70 of the transcript, Officer Baer says that he saw two balls – he doesn't say crack, but he says two balls of cocaine. Now, balls of cocaine can only be crack. Powder is otherwise. Powder is powder. Huh? Powder is powder, he said. Right. So he sees the crack cocaine on top. He's charged with crack – certainly they had the right to grab that crack cocaine, because that was in plain view. Now, as far as rummaging around in the bag, where they found the other cocaine, possibly there's a problem with that, and the district court didn't address that issue. But even if that was excludable, there is – even suppressed evidence can be used at sentencing, and that was the only thing that was used for. He pled guilty to possession with intent to distribute in excess of 28 grams of cocaine base, or crack, what they found on the top of the bag. So any suppression of what else was found in the bag – marijuana wasn't used, it was just the cocaine that was found in there. And Officer Brick said he did have to move things around to find the other cocaine in there. Right. But it's really not – Can I interrupt just a second? I have sort of a separate question, and that is the – when was the key card voided, where he couldn't get back in? Because that would be an effective eviction. The record isn't clear on that, Your Honor. Well, the only thing that's clear is they left. Everybody left. They probably went out the sliding door or something, maybe. I don't really know what went on. Maybe they didn't. But whatever it was, there was the complaint, they had the whatever CO2 or whatever detection, which I assume is some kind of a smoke detector. Yes, I think it's a carbon monoxide detector. Whatever it is. But it's a smoke detector at the same time. Right. The smoking sets it off, I guess. Whatever at least lets alert. But then you void the key card. That's when he couldn't get back in. He wanted to go in and go to sleep, but he couldn't even get back in, and that's when he gets the sign on the door, says, I've got your dope. Call me or something like that. Yeah. That's what – But this is 2 in the morning. Well, it's not real clear when that happens. When he came back. They went somewhere. Yeah, when he came back, I think they said, I think Ms. O'Neill said he came back about 10 minutes after the officers left and couldn't get into his room. And I'm just going by now. All I'm saying is that when you void the key card, that's an effective eviction. Well – He couldn't have gotten back in there whether they took the bag or not. Now, maybe they would have let him or something. And the officers were there to evict the people. The officers also said that they made a lot of noise when they were approaching the place because they were hoping the people would leave and they wouldn't have to have a confrontation when getting the people out. But I see my light is up, and I ask that the court affirm the – I also want to, well, the court affirm the judgment of the district court. Thank you very much. All right. Thank you very much. Anything further, Mr. Lanio? Just a couple quick points. When Officer Baer came to the hotel to respond to the dispatch, at that point the hotel clerk did not want them evicted. He expressed that we don't want to have to keep coming back here to tell people to keep the noise down, that type of thing. And then she says – then she changed her mind and said, okay, well, then I want them evicted. And this is in whose – where is this? This is in Officer Baer's testimony. Okay. Second, I just want to mention that the cases that have been cited by the government, Procknell, Curlin, those are all pretty extreme factual circumstances. In Curlin, the guy had been evicted. There was an order of eviction from a court. The police kept on coming back for a period of two weeks trying to find him, and that's when they eventually were able to evict him. In Procknell, that involved a tasering of the guy when he was actually in the hotel lobby in one of the hallways. They had to taser him several times before they got him down. They went briefly into the hotel room to get the dog, and that's when – Thank you. Thank you very much. And you were appointed too. Thank you very much for undertaking the appointment. Thanks as well to the government. We'll take the case under advisement, and the court will be in recess.